## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ERIK CHAVEZ and PETER JANG, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>APEX CLEARING CORPORATION<br><br>        Defendant. | Case No. _____<br><br>**CLASS ACTION**<br><br>**COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs, Erik Chavez and Peter Jang (collectively, "Plaintiffs"), on behalf of themselves and all other customers of Defendant and investors (the "Class"), bring this Class Action Complaint against Defendant Apex Clearing Corporation ("Defendant" or "Apex"), for negligence, breach of fiduciary duty, and alternatively, breach of the implied covenant of good faith and fair dealing and tortious interference with a business relationship, demanding a trial by jury.

## <u>INTRODUCTION</u>

1.      Apex is a broker-dealer providing services to its direct customers, to approximately one hundred correspondent introducing broker-dealers and to customers introduced to Apex by those introducing broker-dealers. The customers introduced to Apex by those introducing broker-dealers are shared customers as between Apex and the introducing broker-dealers ("Shared Customers").

2.     On the morning of January 28, 2021, Apex unilaterally and abruptly blocked its direct customers and instructed its introducing broker-dealers to block their Shared Customers from purchasing shares of AMC Entertainment Holdings, Inc. (symbol: AMC), GameStop Corporation (symbol: GME), and Koss Corporation (symbol: KOSS) for a period of time lasting approximately three hours and twenty-five minutes. Apex's decision to implement this unilateral, one-way trading suspension—unprecedented in the long history of securities trading in this country—was designed to and foreseeably impeded additional price appreciation and suppressed the prices of AMC, GME, and KOSS.

3.     Leading up to January 28, 2021, AMC, GME, and KOSS (collectively, the "Suspended Stocks") experienced increased trading volume concentrated in portfolios of firms that, among other activities, support individual investors, and include Apex's introducing broker-dealers such as Ally Financial, Dough, M1 Finance, Public.com, Sofi, Stash, Tastyworks, and WeBull Financial LLC (collectively, with the additional Apex introducing broker-dealers the "Introducing Broker-Dealers").

4.     By its own admission, Apex shut down only one side of the market for the Suspended Stocks, the demand-side of AMC, GME, and KOSS stocks, based on a possible future collateral requirement, that Apex had not even bothered to confirm and kept in place the one way shut down, for approximately three hours *after*

receiving notice that the actual collateralization number was lower and was, in fact, at a level that Apex believed warranted lifting the shutdown.

5.     Contrary to governing industry rules and regulations aimed at addressing market volatility, duties of due care and good faith as a broker-dealer registered with the U.S. Securities and Exchange Commission ("SEC") and a Financial Industry Regulatory Authority ("FINRA") member, and shared customer and investor expectations, Apex failed to take reasonable steps to protect its customers and investors in times of market volatility. As alleged herein, Apex failed to adequately mitigate risk and knew or should have known that the abruptly implemented, one-way trading suspension it imposed directly and through its Introducing Broker-Dealers would and did harm Apex customers and investors.

6.     By imposing restrictions on only one side of the transaction—the buy side—Apex not only deprived Plaintiffs and Class members of the ability to purchase the Suspended Stocks, but it intended to and did cause the price of the Suspended Stocks to spiral downward to artificially suppressed prices by allowing selling to continue. These artificially suppressed prices continued to permeate in the market even after the trading suspension was lifted.  This reaction was foreseeable and was within the control of Apex.

7.     As a result, Plaintiffs and Class members were forced to sell at artificially suppressed prices or watch as the value of their holdings fell

3

precipitously.

8.      Plaintiffs assert claims for negligence, breach of fiduciary duty and alternatively, breach of the implied covenant of good faith and fair dealing and tortious interference with a business relationship on behalf of themselves and the Class as set forth herein.

## JURISDICTION AND VENUE

9.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because this is a class action subject to the Class Action Fairness Act ("CAFA"), Pub.L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.), with aggregate claims of all members of the proposed class and subclass(es) in excess of $5 million, exclusive of interest and costs, and there are more than 100 putative Class Members. Many members of the proposed Class are citizens of a state different from Defendant. This Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy as the claims within the Court's original jurisdiction.

10.      This Court is the proper venue for this action because Defendant Apex is incorporated in New York, has offices in New York and many of the acts complained of, on information and belief, were directed from New York. Apex's key personnel are New York based. Apex CEO William Capuzzi identifies his

"Contact info" on his Linked-In page under "New York City Metropolitan Area." Apex Chief Administrative Officer William Brennan lists a "Summit, New Jersey" location and lists work locations as both Dallas (May 2016 - Present) and Greater New York City Area (September 2019-Present). And an Apex' Chief Compliance Officer recent job posting is listed for an Apex New York office at 28 Liberty Street, New York, NY. In addition, Apex's parent, Apex Fintech Solutions LLC is headquartered in New York City and managed by the same management team that manages Apex. Apex Fintech Solutions LLC is a Peak6 Investments LLC ("Peak6") brand. Peak6 and Apex Fintech Solutions LLC are both located at 888 7th Avenue, 32nd Floor, New York, NY.

11.     Jurisdiction and venue are proper in this District pursuant to 28 U.S.C. § 1391 because Defendant is licensed to do business in this District, has transacted business, maintained substantial contacts, or committed tortious acts in this District, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

12.     This Court has personal jurisdiction over Apex because Apex: (a) transacted business throughout the United States, including in this District; (b) transacted in substantial amounts of the Suspended Stocks throughout the United States, including in this District; (c) had substantial contacts within the United States, including this District; and/or (d) engaged in actions that had a direct, foreseeable,

and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

## PARTIES

### A. <u>Plaintiffs</u>

#### i. **Erik Chavez**

13.    Plaintiff Erik Chavez is a resident of the State of Arizona.

14.    Plaintiff Chavez is an investor who used Webull Financial LLC ("Webull") as his introducing broker-dealer and Apex as his clearing broker. The trading account was carried by Apex Clearing Corporation.

15.    As of the end of the day on January 27, 2021, Plaintiff Chavez held 607 shares of AMC stock.

16.    On February 2, 2021, Plaintiff Chavez sold all of his shares of AMC stock for less than he would have sold for but for the conduct alleged herein.

#### ii. **Peter Jang**

17.    Plaintiff Peter Jang is a resident of the State of Maryland.

18.    Plaintiff Jang is an investor who used Ally Invest Securities ("Ally") as his introducing broker-dealer and Apex as his clearing broker. The trading account was carried by Apex Clearing Corporation.

19.    As of the end of the day on January 27, 2021, Plaintiff Jang held 3,500

shares of GME stock in his account at Ally.

20.     On February 4, 2021, Plaintiff Jang, who had journaled his shares of GME to a different brokerage house, sold 401 shares of GME stock for less than he would have sold for but for the conduct alleged herein.

21.     Plaintiffs have a legally protected interest in their financial losses arising out of Defendant's conduct alleged herein.

## B. <u>Defendant</u>

22.     Defendant Apex is a New York corporation with offices in New York and a principal place of business at One Dallas Center, 350 N. St. Paul, Suite 1300, Dallas, Texas. Apex's parent, Apex Fintech Solutions LLC is headquartered in Manhattan at the same location that its parent, Peak6, has offices.

23.     Apex is a broker-dealer registered with the SEC and a member of FINRA.

24.     Apex was a broker-dealer for certain direct customers and a clearing broker-dealer for Introducing Broker-Dealers and their Shared Customers.

## <u>FACTUAL ALLEGATIONS</u>

25.     Apex provides clearing broker services to correspondent introducing broker-dealers and customers introduced to Apex by those introducing broker-dealers. These customers are shared as between Apex and Apex Introducing Broker-Dealers ("Shared Customers"). Apex also serves as a broker-dealer to direct

customers not introduced to them through an introducing broker.

26.     Apex's Introducing Broker-Dealers, who have less operational capability and regulatory capital, and lack direct access to trading platforms and clearinghouses, rely on Apex to access those capabilities and services.

27.     Apex, in performing its broker-dealer, clearing, and settlement functions as a broker-dealer and a clearing broker, is a member of the National Securities Clearing Corporation (NSCC).

28.     In January 2021, Apex was a broker-dealer and a clearing broker-dealer for Shared Customers, including Plaintiffs, who traded in the Suspended Stocks on Apex's Introducing Broker-Dealers' platforms. Apex's Introducing Broker-Dealers during the Class Period include, but are not limited to, Ally, Dough LLC, M1 Finance, Public.com, Stash, and Webull.

29.     On January 28, 2021, Apex blocked its direct customers and required all of its Introducing Broker-Dealers to block their Shared Customers, including Plaintiffs, and all other members of the Class, from purchasing Suspended Stocks, or call options on such stocks, while allowing selling to continue.

30.     Apex lacked the tools needed to manage the known risks associated with increased trading volume and price volatility, culminating in the events of January 28, 2021 as described herein.

A. **Industry Standard of Care**

   i.   **Managing Market Risk: Collateral Deposit and Capital Requirements**

31.     To manage risk to the markets and utilize the Depository Trust Clearing Corporation's (DTCC) Insurance Services, broker-dealers such as Apex become NSCC members. The DTCC keeps a record of the stocks owned through the clearing brokerage firms for NSCC members, including Apex, and establishes financial requirements for clearing brokerage firm members, which include deposit requirements designed to reduce risk to the DTCC.

32.     NSCC is the central counterparty that clears cash transactions in the U.S. equities markets, netting securities deliveries and payments among NSCC's clearing members, and guaranteeing completion of trades even if one party to the transaction defaults.

33.     As President and Chief Executive Officer of the DTCC, the Fixed Income Clearing Corporation ("FICC"), and NSCC, Michael C. Bodson ("Bodson"), explained:

> The U.S. Markets are multi-layered, and customers generally execute trades through one or more brokers or broker-dealers. NSCC direct clearing members are responsible for completing their customers' trades at the NSCC. NSCC's rules outline clear financial and operation risk management obligations that apply to direct clearing members.

DTCC Testimony to U.S. House Financial Services Committee ("Bodson DTCC

Testimony"), at 1 (May 6, 2021).

34.    Apex was at all times fully aware of its obligations to maintain requisite capital levels, satisfy cash deposit and collateral requirements with the DTCC and NSCC, and the serious consequences of violating those obligations.

35.    To clear and settle customer transactions, each trading day by 10:00 am ET, broker-dealers like Apex have to meet the deposit requirements required by the DTCC to support their customer trades between the trade date and the date the trades settle. On some days broker-dealers may be able to withdraw money that they left on deposit, whereas on other days they may be required to deposit additional money, depending on that day's requirement. Firms like Apex also know that DTCC may assign a volatility multiplier on certain securities which the DTCC perceives as having more risk.

36.    Based on its customers' orders, Apex is able to (i) monitor its anticipated DTCC deposit requirements in real time (or near real time); and (ii) monitor its ability to meet anticipated or actual DTCC deposit requirements in real time (or near real time).

37.    NSCC's volatility-based margin requirements stipulate the capital charges that should be borne by firms based on various measures of the volatility of firms' stock positions. This analysis generally uses several metrics to measure volatility of the stock positions and applies a "Gap Risk" measure for firms that have

high concentrations in volatile stocks and a "Portfolio Margin Floor" measure to ensure that the margin requirement does not drop below certain value-based measures. These margin requirements are intended to protect DTCC members and the market as a whole from the systemic risk that highly volatile stocks can produce, especially when a broker's position has significant risk concentration in such stocks.

38.    As explained by Bodson in his Congressional testimony, margin requirements protect NSCC and all market participants against clearing member defaults. NSCC collects clearing funds, or margin, at the start of each day and intraday in volatile markets. According to Bodson, the calculation and timing of these margin requirements are known to every member, including Apex.

39.    Apex knew or should have known of its anticipated DTCC deposit requirements given the trading activity in the Suspended Stocks during the week prior to January 28, 2021, and that failure to prepare for the anticipated DTCC deposit requirements would impair its ability to perform its obligations as a broker-dealer and a clearing broker to its large customer base, as required under SEC and FINRA rules and regulations.

40.    Pursuant to 17 C.F.R. § 240.15c3-1 (the "Net Capital Rule"), the SEC requires broker-dealers to "at all times have and maintain net capital" no less than the greatest of the minimum requirement applicable to its business. 17 CFR § 240.15c3-1(a). The Net Capital Rule is designed to require broker-dealers to

maintain sufficient liquid assets to meet all obligations to customers.

41.     By virtue of obligations under the law and industry rules and practice, broker-dealers cannot simply unilaterally decline to accept a customer's order because it is inconvenient or unprofitable, or because a clearinghouse demands additional capital.

42.     Apex did not properly respond to the NSCC in a manner that should be expected. Instead, it chose to interfere with the market and its Shared Customers.

### ii.     Governing Broker FINRA Rules and Regulations

43.     "Broker-Dealers," including Apex, are required to register as members of self-regulatory organizations ("SROs"), such as FINRA, the largest non-governmental securities regulator for broker-dealers in the United States, and to comply with all applicable state laws and regulatory requirements.

44.     FINRA rules are designed primarily to protect customers, investors, and efficient markets. FINRA Rule 2010 sets forth the guiding principle which every brokerage firm in the United States must follow and mandates, "in the conduct of its business, [brokerages] **shall** observe high standards of commercial honor and just and equitable principles of trade." (Emphasis added). FINRA Rule 2010 (Standards of Commercial Honor and Principles of Trade); NASD Interpretive Material 2310-2, Fair Dealing with Customers ("Implicit in all member and registered representative relationships with customers and others is the fundamental

responsibility for fair dealing. Sales efforts must therefore be undertaken only on a basis that can be judged as being within the ethical standards of [FINRA's] Rules, with particular emphasis on the requirement to deal fairly with the public." FINRA reiterates in Regulatory Notice 21-12, "the foundation of the securities industry is fair dealing with customers. . . *even during times of market stress*." (emphasis added); *see also* FINRA By-Laws, Article XI (authorizing the Board to adopt rules or amendments to, among other things, "protect investors and the public interest, . . . promot[e] [] fair practices . . .").

45.     In assuring investor protection and the integrity of the firm's financial condition, FINRA obligates broker-dealers, and Apex had a duty to establish, maintain, and enforce a supervisory system, which includes monitoring its technology and other risks*,* including credit and other systemic risks (FINRA Rule 3110, Supervision), and *engage in continual risk management to ensure continuation of its trading and financial "mission critical systems*." (FINRA Rule 4370, Business Continuity Plans). NASD Notice to Members 99-92, "Broker-Dealer Risk Management Practices Joint Statement of the SEC, NASD and NYSE" (July 29, 1999) (emphasis added).

46.     As a FINRA registered broker-dealer, Apex is supervised by FINRA and subject to its Rules.

47.     As a broker-dealer, Apex owes Plaintiffs and the Class a duty of due

care and loyalty, including, *inter alia*, handling customer orders promptly and in a manner best suited to serve the customer's interests, not arbitrarily shutting down the ability to purchase, and refraining from putting their own interests ahead of their customers interests. Moreover, as further described below, broker-dealers owe a duty to reasonably ensure that they can continue to provide investors access to the securities markets during times of extreme market volatility.

48.     Additionally, broker-dealers (and importantly here) have a duty and are obligated to implement and utilize daily (even hourly) risk assessment tools to manage potential operational and credit risks.

49.     Violations of FINRA rules by broker-dealers can be used as evidence of negligence. *See Brink v. Raymond James & Assocs., Inc.*, 892 F.3d 1142 (11th Cir. 2018).

### iii.     Circuit Breakers: Procedures for Brokers to Operate During times of Extreme Market Volatility

50.     Broker-dealers are expected to ensure that they can continue to provide access to the securities markets during periods of extreme market volatility.

51.     In fact, FINRA reiterated this obligation of broker-dealers to effectively manage their liquidity during extreme market conditions in Regulatory Notice 21-12, which was issued on March 18, 2021, directly in response to the events giving rise to this action. FINRA was clear in its reminder: "Member firms should maintain strong procedures, thoughtfully crafted in advance, to reasonably ensure

that they can continue to provide investors access to the securities markets during times of extreme market volatility, as in the past several months." These include "liquidity management practices to ensure the firm is able to continue to provide customers with access to the markets despite abnormal liquidity demands." *See* Regulatory Notice 21-12, *available at* https://www.finra.org/rules-guidance/notices/21-12.

52.     There is an industry-recognized mechanism by which trading is halted during volatility: A circuit breaker is an emergency-use regulatory measure imposed by an exchange to temporarily halt trading on an exchange. Circuit breakers are in place to try to curb in panic-selling. They can also be triggered on the way up with manic-buying.

53.     However, when an exchange employs a "circuit breaker" it is done for a limited time period, typically lasting mere minutes—not *hours or days*, which is a figurative lifetime in the multi-trillion-dollar public markets.

54.     Moreover, no mechanism exists by which an exchange imposes a circuit breaker that restricts only one side of the trading such that sales are permitted, but purchases are not. Either all trading is or is not halted by an exchange. Exchanges do not employ "circuit breakers" to allow only one-sided trading.

55.     Here, the exchanges did impose very limited temporary trading halts regarding the buying and selling of the Suspended Stocks on January 28, 2021.

56.     Nowhere do the securities laws or rules contemplate that any broker-dealer will ever employ a self-declared circuit breaker and unilaterally halt trading or allow only one-sided trading for an indefinite time period in any security without direction from an exchange. This is part of what makes Defendant's actions, even if taken over a short period of time, extraordinary, unprecedented, and unlawful.

57.     To be clear, Plaintiffs are not alleging that Defendants are barred from placing reasonable restrictions on trading.  Defendants are barred however from using their unpreparedness for events – as here - to only restrict partial – one-way trading (purchases) where the intent of such restriction, as here, was to decrease the value of the securities.

**B. The Events of January 2021**

    **i.    Increased Trading Volume and Price Volatility Ahead of January 28, 2021**

58.     "Short squeezes" and market volatility are frequent occurrences in securities trading. Leading up to January 28, 2021, as Apex well knew or had reason to know, individual investors increased demand for the Suspended Stocks, causing their price to increase.

59.     Some institutional investors also increased demand for the Suspended Stocks, including Scion Asset Management, LLC, which spent approximately $15 million purchasing GME, and Ryan Cohen, founder of Chewy.com, who invested

$76 million in GME. During this time, certain hedge funds and market makers were shorting the Suspended Stocks.

60.     Plaintiffs and Class members continued to go long on GME and other Suspended Stocks. Given the operation of a free and open market, the prices of GME and other Suspended Stocks were bid up and prices increased. GME, for example, increased 78.46% from $43.03 per share on January 21, 2021, to $76.79 per share on January 25, 2021. This exposed short sellers in those stocks to substantial losses.

61.     Despite certain investors' short selling, which tends to drive the prices down, the market volatility brought on by increased demand for the Suspended Stocks drove the market prices up, exposing short sellers to massive losses on their short positions.

62.     Increasing prices forced certain holders of short positions to either close-out their short positions by purchasing shares or post additional capital to ensure that they had enough money to re-purchase and return the shorted stocks.

63.     As holders of short positions re-purchased the shorted stocks, this covering put further upward pressure on the stock prices which put further pressure on short sellers to purchase the Suspended Stocks at the current (and rising) prices in order to cover their losses and forestall potentially greater losses. This "pressure" is what is referred to as a "short squeeze."

64.     In a "short squeeze," individual investors like Plaintiffs and the Class

will benefit (absent one-sided market restrictions) as the value of the stocks they purchased increases. Short sellers, on the other hand, risk further losses, as stock prices rise as a natural consequence of market forces.

65.    Substantial trading activity in the stock and options contracts among the Suspended Stocks continued on January 27, 2021. On that day, the prices of the Suspended Stocks increased as trading volumes in U.S. cash equities and options hit 24.5 billion shares traded and 57.1 million contracts traded. GME's stock peaked at $380.00, before reaching a closing high of $347.51, a 134.84% increase from the previous day. AMC's share price increased by approximately 300% from the previous day's close. KOSS's share price increased by approximately 480% from the previous day's close.

66.    The SEC Staff, but not the Commission, reported on page 22 in "Staff Report on Equity and Options Market Structure Conditions in Early 2021" dated October 14, 2021 ("SEC Staff Report") available at https://www.sec.gov/files/staff-reportequity-options-market-struction-conditions-early-2021.pdf with reference to GME that:

> Yet while the swings in GME's share price and volume attracted significant attention, they were not unusual for January 2021. For instance, single-day price changes on January 27 from the closing prices on January 26 for KOSS (480.0%), AMC (301.2%), NAKD (252.3%), and Express, Inc. (symbol: EXPR) (214.1%) were larger than any single-day GME price change… In fact, since 2020 began, 134 common stocks had at least one one-day price increase greater than GME's largest one-day price increase…(internal citations omitted).

67.    Moreover, the SEC Staff Report noted as to GME and the increased trading volume in January 2021, "[t]he underlying motivation of such buy volume cannot be determined; perhaps it was motivated by the desire to maintain a short squeeze. Whether driven by a desire to squeeze short sellers and thus to profit from the resultant rise in price, or by belief in the fundamentals of GameStop, it was the positive sentiment, not the buying-to-cover, that sustained the weeks-long price appreciation of GameStop stock." SEC Staff Report at 26.

68.    When Apex undertook the extraordinary measure on January 28, 2021 of suspending and directing the suspension of the purchasing of the Suspended Stocks, stocks that were in great demand, Apex caused the price of each of the Suspended Stocks to go down and to trade at lower prices than they would have traded for absent Apex's misconduct.  Moreover, Apex undertook the extraordinary measures on January 28, 2021 of suspending trading in the Suspended Stocks without a plan reasonably designed to correlate its supposed reduction of risk to its extraordinary action.

### ii.    Apex Mandates Unprecedented, One-Sided Trading Suspensions

69.    At 5:00 p.m. EST, on January 27, 2021, the SEC released a statement that it was "aware of and actively monitoring the on-going market volatility in the options and equities markets," but neither the SEC nor any other government agency,

including DTCC, issued any directive to restrict trading in the Suspended Stocks.

70.     On the morning of January 28, 2021, Apex blocked its direct customers and directed its Introducing Broker-Dealers to block its Shared Customers from purchasing shares of AMC, GME, and KOSS. Apex's decision to implement this unilateral one-way trading suspension (halting of the buying, but not the selling) was designed to and foreseeably impeded additional price appreciation and suppressed the prices of the Suspended Stocks during and beyond the Class Period causing ascertainable damages and injury.

71.     Anthony Denier ("Denier"), the CEO of Webull, an Apex introducing broker-dealer that restricted trading in the Suspended Stocks, placed the blame squarely on Apex. According to Denier, the collateral required by Apex for GME increased by 100% and Apex had informed him that Webull needed to shut off the ability to open new positions in certain stocks. Denier further said that the restrictions originated the morning of January 28, 2021, and Webull was informed that Apex was instructed by DTCC that it was increasing the collateral needed to settle trades for the Suspended Stocks.

72.     In written responses to the House Committee on Financial Services on February 9, 2021, WeBull acknowledged that "[o]n January 28, 2021, at 11:30 AM EST Webull announced on Twitter and Facebook that it was restricting trading in GME, AMC, and KOSS." In restricting the stocks, WeBull posted, "Please note that

we will no longer allow clients to open new positions in following three stocks: AMC, GME and KOSS." On the same day between 2:42 PM and 2:43 PM, Webull posted an update to Twitter and Facebook lifting the restriction.

73.    Other Apex Introducing Broker-Dealers, including Ally, Dough, Public.com, SoFi, Stash, and Tastyworks, also reported that Apex had instructed them to halt all opening (purchase) transactions of GME, AMC, and KOSS on their platforms.

74.    For example, Dough tweeted, "[o]ur clearing has notified us that we must set GME, AMC, and KOSS to closing only. We will comply." Public.com similarly tweeted, "[o]ur clearing firm, Apex Holdings, has decided to halt the buying of $KOSS, $GME, and $AMC."

75.    Various Introducing broker-dealers, including SoFi, publicly stated their disagreement with Apex's unprecedented unilateral one-way trading suspension. Public.com subsequently tweeted "[w]e disagree with this decision and are working hard for our members to resolve the issue."

76.    Apex customers complained directly to Apex about the impact of its decision to halt its customers' ability to buy. For example, one Apex customer emailed Apex and asked to

> [E]scalate this immediately. The longer this goes on the
> worse it is for us. We have carefully built our business over
> the years and taking advantage of rare opportunities like
> this are very important.  We need service from APEX on

the day it really matters. We truly believe this is unacceptable and unnecessary. We are willing to put in risk mitigating criteria such as: We will trade no more than 300 shares. If shorting is somehow a larger perceived risk at 300 shares, then we will go long-only. Please understand that 300 shares of GME is currently worth around $75k. At its all-time high of $500 that is about $150k. Even if the stock halted and went to zero we have plenty in the account…to cover this. The same is true for KOSS and AMC (which are far less expensive). We will trade no more than 300 of each. Please let me know who we can speak too and when." When this request was circulated internally to senior leadership at Apex, Apex's head of institutional clearing responded by email, "that's a reasonable ask from my perspective."

77.     Apex restricted purchasing across the board to all their clients, including their Apex Introducing Brokers and Shared Customers, based on higher numbers Apex received from the DTCC on January 28, 2021, at 9:30 a.m. EST. Apex's internal documents reveal that it did not even try to confirm the high number or seek to negotiate it down.

78.     Instead, Apex communicated to the Apex Introducing Broker-Dealers, such as Public.com on January 28, 2021, at 10:30:40 a.m., in an email entitled "EMERGENCY NOTICE: GME, AMC, and KOSS Liquidations Only, Thursday, January 28, 2021",

Apex would like to inform you that the below listed stocks should be liquidation only on your systems whether proprietary or through a 3rd party. This would include both equities and all option series, most importantly the January 29th 2021 expiration. These positions have been previously set at 100% margin and will continue for the foreseeable future. GME: GameStop AMC:

AMC Entertainment KOSS: Koss Corp.

Please note that there might be additional securities added to this restriction list before market close today, additional messages may follow. If you have any questions please contact our Risk Department (risk@apexclearing.com), or your Client Partner/Relationship Manager.

Thank you,

Apex Clearing Corporation

79.     In documents submitted to regulators, Apex sets forth the following timeline: "On January 28, 2021 at approximately 9:30 a.m. Eastern time (8:30 a.m. Central time), Apex received from NSCC a report showing a projection of a substantially increased clearing deposit requirement for Apex."  At approximately 11:31 a.m. Eastern time (10:31 a.m. Central), "Apex sent a client communication to all clients instructing them to restrict the purchase of new buy positions in AMC, GME and KOSS… The restrictions were imposed uniformly across all Apex clients." At approximately 11 a.m. (presumably Eastern time; 10:00 a.m. Central time), "Apex received an updated NSCC report showing a potential collateral deposit requirement that was elevated but lower than the 9:30 a.m. report and in line with reports Apex had received from NSCC prior to 9:30 a.m. that day. After confirming with NSCC that the new report was accurate, Apex communicated to all clients the lifting of the restriction of new purchases of AMC, GME and KOSS at approximately [2:55 p.m. Eastern Time] 1:55 p.m. [Central Time] on January 28,

2021."

80.    Apex has maintained that, "[t]he reason for the …trading restrictions that Apex imposed regarding purchases of AMC, GME and KOSS relates directly to the potential future collateral requirement that NSCC appeared it may impose on Apex as part of the margin system NSCC maintains to comply with the SEC's standards for covered clearing agencies."

81.    Yet, by its own admission, by 11:00 a.m. (presumably, Eastern time; 10:00 a.m. Central Time), Apex knew from the DTCC that the collateralization number was in fact lower and in line with its expectations and ability to pay, but waited, according to internal documents, until 2:55 p.m. Eastern to lift the trading suspension and notify Apex Introducing Broker-Dealers to allow purchases again.

82.    Moreover, DTCC's document production demonstrates that DTCC certainly knew by 10:41 a.m. Central Time (11:41 a.m. Eastern) that Apex's collateral exposure was going down and that there was a call between DTCC and Apex senior management six minutes later at 10:47 a.m. Central Time (11:47 a.m. Eastern Time).

83.    In other words, Apex placed the unprecedented, unilateral one-way trading suspension at approximately 10:31 a.m. Central time: 1) prior to any consultation with the DTCC in order to confirm the higher collateral number transmitted to Apex at approximately 8:30 a.m. Central time; 2) approximately 30

minutes after it had already been informed by the DTCC at 10:00 a.m. Central time that the collateral number was lower and at a level that Apex did not believe warranted the trading suspension; and 3) approximately 16 minutes before having the opportunity to confirm the lower collateral number with DTCC telephonically.

84.    In light of information known to Apex, by its own accounting, Apex should not have implemented the unprecedented, unilateral one-way trading suspension when it did, and, in any event, it should have removed the suspension within minutes of implementing it rather than allow the trading suspension to be in effect for approximately three hours and twenty five minutes.

85.    In fact, as Apex has admitted, "NSCC did not collect or demand additional collateral from Apex intraday in this instance." (*Id.*)

86.    Not only was Apex not required to pay any additional collateral on January 28, 2021, Apex admitted subsequently that there never an issue as to its ability to meet its capital requirements.

87.    On March 4, 2021, former Apex President, Tricia Rothschild, in an interview with "Financial Planning", was asked whether she was "able to specify whether Apex Clearing had to raise capital" in connection with the events of January 28th.  At no time did Rothschild suggest that Apex needed to raise capital on January 28, 2021.  Instead, Rothschild stated, "[w]e have headroom in terms of the capital available to us on our balance sheet.  We have lines of credit that we can call on as

needed."

88.     Similarly, in an earlier draft "Talking Points For Use With Clients-January 31," Apex was unprepared to answer the most basic questions it anticipated being asked by its clients, such as, "You are affiliated with Peak6. Can't Peak6 infuse the business with capital? [need answer]."

89.     On January 28, 2021 PEAK6 Investments LLC ("PEAK6") was the majority owner of Apex Clearing Holdings LLC, ("ACH").  Apex, on January 28, 2021 was a wholly owned subsidiary of ACH.  Plaintiffs are unaware of any attempt by Apex to seek any cash infusion from any source including PEAK6 or any financial institution on January 28, 2021 in order to address any collateral requirement of DTCC.  Instead, Apex imposed the one-way trading suspension which harmed its own customers, its Shared Customers and the market.

90.     On January 29, 2021, Apex again saw the buildup in trading volume in AMC and GME and was discussing internally the possibility of imposing further limits on these securities. Apex's Chief Administrative Officer, William Brennan, noted, "we can't shut down access to the names. We are getting killed in the press. I told Bill to have Matt raise a few hundred in capital this weekend."

### iii.     Almost All Other Broker-Dealers Did Not Impose Similar One-Sided Restrictions, Which Regulators Criticized as "Disadvantageous" to Investors

91.     Broker-dealers who had unilaterally suspended trading on January 28,

2021, knew that their aggressive actions to restrict trading crossed the boundaries of acceptable behavior.

92.     Unlike Apex, other broker-dealers with long-standing risk management practices did not take the extraordinary measure of unilaterally implementing one-sided trading restrictions on stocks at issue here.

93.     For example, neither Charles Schwab & Co. nor TD Ameritrade halted buying *or* selling of *any* stocks or basic options during the Class Period. Instead, amidst price volatility, both firms "put in place some restrictions on certain types of options transactions to help mitigate risk," adjusted "margin requirements in highly volatile securities," and restricted advanced options strategies such as selling naked call options. *See* Charles Schwab Corporation Statement on Recent Trading Activity, Charles Schwab Corp., https://www.aboutschwab.com/schwab-statement-on-recent-trading-activity (posted Jan. 28, 2021).

94.     These steps, as opposed to those taken by Apex, arguably "appropriately balance investors' ability to trade these securities with the firm's duty to protect itself from potentially absorbing losses incurred by an individual's trading or investing strategies." *Id*.

95.     On January 29, 2021 the SEC issued a statement about brokers' responses to volatility in the Suspended Stocks, noting that, "The Commission will closely review actions taken by regulated entities that *may disadvantage investors*

*or otherwise unduly inhibit their ability to trade certain securities*." *See* Statement
of Acting Chair Lee and Commissioners Peirce, Roisman, and Crenshaw Regarding
Recent Market Volatility, *available at* https://www.sec.gov/news/public-statement/joint-statement-market-volatility-2021-01-29 (emphasis added).

C. THE APEX CUSTOMER AGREEMENTS

96.     Apex required each of its Direct Customers and each of its Shared
Customers to enter into Customer Agreements.

97.     These Agreements did not pertain to any singular particular
transaction(s), did not permit for the specific performance of any particular trade(s)
and did not contemplate the permitting of the sales of securities in liquid stocks while
halting purchases of those same securities.  At no time did any Direct Customer or
Shared Customer consent to the restrictions imposed by Apex complained of herein
which were designed to and did force the price of the Suspended Stocks to go down
to the detriment of Plaintiffs and the putative Classes.  In addition, each Shared
Customer, and, on information and belief, each Direct Customer is provided with a
Customer Information Brochure that provides,  "[w]e may refuse to accept any order
if we ***in good faith*** determine that we should." (emphasis added).  This language too
did not contemplate the one- sided trading suspension Apex imposed for the purpose
of driving down the price of the Suspended Stocks to the detriment of its customers.
Moreover, as alleged herein, Apex did not impose the trading suspension in "good

faith."

## **CLASS ACTION ALLEGATIONS**

98.    Plaintiffs bring this case individually and pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and (b)(3) on behalf of the following proposed nationwide classes:

**I.    Nationwide Investor Class**

All persons or entities in the United States that:

    i.    held shares, or call options for shares, of any of GameStop Corp. (GME), AMC Entertainment Holdings Inc. (AMC), or Koss Corporation (KOSS) (the "Apex Suspended Stocks"), as of the end of the day on January 27, 2021, and

    ii.    sold such shares, or call options for shares, of the Suspended Stocks, or were forced to let such call options expire worthless, between January 28, 2021 and February 23, 2021 (the "Class Period"); and

    iii.    suffered damages.

**II.    Apex Broker-Dealer Class**

    i.    All Apex broker-dealer direct customers and Shared Customers who held shares of AMC, GME, and/or KOSS stocks or call options for shares of AMC, GME, and/or KOSS as of the end of the day on January 27, 2021, who sold any such shares or call options, or were forced to let such call options expire worthless, during the Class Period, and suffered damages;

    ii.    All Apex broker-dealer direct customers and Shared Customers who placed a sale order on shares, or on call options for shares, of AMC, GME, and/or KOSS, whose orders were delayed during the Class Period, and suffered damages; and

    iii.    All Apex broker-dealer direct customers and Shared Customers who placed a buy order for shares, or for call options for shares, of AMC, GME, and/or KOSS, whose order was initially accepted by Apex or the Apex Introducing Broker-Dealers, whose order was ultimately rejected by Apex or the Apex Introducing Broker-Dealers during the Class Period, and suffered damages.

Excluded from the proposed Classes are:

    i.    Any Defendant named herein;

    ii.    Any of the Defendant's parent companies, subsidiaries, and affiliates;

    iii.    Any of the Defendant's officers, directors, management, employees, or agents;

    iv.    Counsel for any of the parties to this action;

    v.    All governmental entities; and

    vi.    The judge and chambers staff in this case, as well as any members of their immediate families.

This action has been brought and may properly be maintained as a class action against Apex pursuant to the provisions of Federal Rule of Civil Procedure 23.

99.    **Numerosity**: The precise number of members of the proposed Classes is unknown to the Plaintiffs at this time; however, based on information and belief, members of the Classes, including sub-classes, number in the hundreds of thousands if not millions. Each Class is so numerous that joinder of all members in a single action is impracticable. All members of the Classes may be notified of the pendency

of this action by reference to Apex's records or by other alternative means.

100.   **Commonality**: Numerous questions of law and fact are common to the claims of the respective Plaintiffs and members of the proposed Classes. These common questions of law and fact exist as to all members of the proposed Classes and predominate over questions affecting only individual members of the proposed Classes. These common legal and factual questions include, but are not limited to, the following:

  i.   Why Defendant restricted trading on January 28, 2021;

  ii.   Whether Defendant's conduct in connection with the Suspended Stocks was negligent, a breach of fiduciary duty, alternatively breached the implied covenant of good faith and fair dealing and/or alternatively tortiously interfered with a business relationship;

  iii.   Whether Defendant breached its duty of care to its broker-dealer customers and Shared Customers when it suspended purchases in the Suspended Stocks and also purposefully instructed its Introducing Broker-Dealers to remove the ability to buy or view certain securities on their respective platforms;

  iv.   Whether Defendant violated regulatory obligations under federal statutes and SRO rules;

  v.   Whether Defendant breached legal, regulatory, and licensing requirements by failing to provide adequate access to financial services;

  vi.   Whether the Plaintiffs and members of the proposed Classes were injured by the Defendant's conduct, and if so, the appropriate measure of damages.

101.   **Typicality**: The claims of each named Plaintiff who is a Shared Customer of Apex and the introducing Broker-Dealer are typical of the claims of the

direct customers of Apex and all Shared Customers. Each purchased one or more of the Suspended Stocks through Apex prior to January 28, 2021 and were harmed by Apex's wrongful conduct during the Class Period.

102.  **Adequate Representation**: Plaintiffs who had a broker-dealer and/or clearing broker relationship with Apex will fairly and adequately represent the interests of the putative Classes in that they have no conflicts with any other members of the corresponding Classes. Plaintiffs have retained competent counsel experienced in prosecuting complex class actions in federal court, including those involving financial services, and they will vigorously litigate this class action on their behalf and on behalf of members of the Class.

103.  **Predominance and Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. A class action is superior to other available means, if any, for the fair and efficient adjudication of this controversy. Prosecution of separate actions by individual members of the proposed Classes would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for broker-dealers.

104.  Additionally, few, if any, members of the proposed Classes could or would sustain the economic burden of pursuing individual remedies for the Defendant's wrongful conduct and it would thus be grossly impracticable because the cost of vindicating an individual class member's claim would likely exceed the

value of the claim. Treatment as a class action will achieve substantial economies of time, effort, and expense, and provide comprehensive and uniform supervision by a single court. This class action presents no material difficulties in management and provides the benefits of a single adjudication.

## CAUSES OF ACTION

### COUNT I
### Negligence

105.    Plaintiffs hereby incorporate by reference paragraphs 1 through 104 as though fully set forth herein.

106.    As a securities broker-dealer and clearing broker-dealer, Apex owes a duty of care to investors to act in accordance with the standard of care used by other broker-dealer professionals.

107.    In offering both trading and clearing services, Apex assumed a duty to ensure that the trading platforms it provided and/or supported were sufficiently equipped to reliably deliver such services under reasonably foreseeable increasing customer demands and resulting market conditions at issue in this case.

108.    Apex had a duty to exercise reasonable care in safeguarding the investments of Plaintiffs and Class members by providing a platform and/or supporting a platform to execute trades that is fair and promptly provides execution of customers trade orders in a lawful manner.

109.    By impeding its customers' and Shared Customers' ability to purchase

the Suspended Stocks and by failing to take reasonable steps to make sure that its trading platform was available and/or supported in times of market volatility Apex violated these duties.

110.   Apex breached these duties and deviated from the standard of care when it suspended its customers' ability to purchase shares of AMC, GME, and/or KOSS and when Apex demanded that Apex Introducing Broker Dealers suspend their Shared Customer's ability to purchase shares of GME, AMC, and KOSS, without even trying to confirm the collateralization number received from DTCC at approximately 9:30 a.m. on January 28, 2021, or seeking to negotiate it down.

111.   Apex breached these duties and deviated from the standard of care when it learned shortly thereafter that the collateralization number was in fact lower than originally communicated to it and was, in fact, at a level that Apex believed warranted lifting the suspension of the purchase of stock, yet failed to lift the suspension of the purchase of shares in GME, AMC and KOSS until hours later.

112.   Apex breached these duties and deviated from the standard of care when it failed to take reasonable steps to mitigate its risk, including, but not limited to raising additional capital rather than suspend its customers, including Shared Customers', ability to purchase shares of GME, AMC, and/or KOSS.

113.   As a direct and proximate result of Apex' conduct as alleged herein, the Plaintiffs and the Classes have been injured and sustained damages.

## COUNT II
## Breach of Fiduciary Duty

114.   Plaintiffs hereby incorporate by reference Paragraphs 1 through 104 as though fully set forth herein.

115.   As an agent of the Plaintiffs, in connection with trades placed or to be placed by the Plaintiffs, Apex owed a fiduciary duty of care, loyalty, and good faith to Plaintiffs, Apex's direct broker-dealer customers, Apex's broker-dealer Shared Customers and the members of the Apex Broker-Dealer Class, by virtue of, among other things, being an agent of the Plaintiffs as well as a provider of financial services and a registered securities broker-dealer.

116.   As a broker-dealer and agent of the Plaintiffs, in connection with trades placed or to be placed by the Plaintiffs, Apex owed fiduciary duties of care, good faith, honesty, and loyalty, to the Plaintiffs and the Apex Broker-Dealer Class, which include, without limitation, the duty to take reasonable steps to provide an open trading platform free of self-imposed trading restrictions and the duty not to act out of a conflict of interest, nor to prefer the fiduciary's self-interest over that of its customers.

117.   Apex breached its fiduciary duties to the Plaintiffs and the Apex Broker-Dealer Class by acting in its own self-interest and contrary to the interests of its direct customers and Shared Customers by suspending customers' ability to

purchase shares of the Suspended Stocks so as to benefit itself at the expense of Plaintiffs and the Class.

118.    Defendant's efforts went well beyond mere ministerial clearing conduct in that Defendant improperly and unjustifiably directed the Introducing Brokers to not allow one way trading in the Subject Stocks by Shared Customers.

119.    Defendant did not engage in halting the purchasing of the Suspended Stocks for merely the brief period where it reasonably believed a higher deposit requirement might be imposed by the DTCC, but instead engaged in the unjustified conduct of halting any buying of the Subject Stocks  for an unjustified period of time.

120.     Apex also owed fiduciary duties to the Plaintiffs and to the Apex Broker-Dealer Class as a clearing broker-dealer and breached those duties to Plaintiffs and all Shared Customers in that Apex was actively and directly involved in the Introducing Broker-Dealers' actions by directing that the Introducing Broker-Dealers suspend purchases of the Suspended Stocks.

121.    As a direct and proximate result of Apex's conduct, Plaintiffs and the Apex Broker-Dealer Class has been injured and sustained damages.

## COUNT III
### Breach of the Implied Covenant of Good Faith and Fair Dealing

122.    Plaintiffs hereby incorporate by reference Paragraphs 1 through 104 as though fully set forth herein.

123.   Plaintiffs allege, in the alternative to Counts I and II, that Defendant breached its implied duties of good faith and fair dealing owed to Plaintiffs and the Apex Broker-Dealer Class.

124.   As a condition to opening a Direct or Shared Customer Account with Apex, such customers are required to accept a Customer Agreement.

125.   Every agreement imposes upon each party a duty of good faith and fair dealing in the performance of the agreement such that neither party shall do anything which will have the effect of destroying or interfering with the right of the other party to receive the benefits of the agreement.

126.   The implied covenant of good faith and fair dealing herein were not in conflict with the express terms of the agreement and, in fact, were wholly consistent with both the terms of the agreement and the intent of the agreement.

127.   Apex by and through the conduct alleged hereinabove, breached the implied covenant of good faith and fair dealing by knowingly restricting one-sided trading (purchases) on January 28, 2021 with the intent of causing the trading price of the Suspended Stocks to go down causing harm, losses and damages to Plaintiffs and the Apex Broker-Dealer Class who had purchased the Suspended Stocks pursuant to the Customer Agreement.

## COUNT IV
### Tortious Interference with Business Relationship

128.   Plaintiffs hereby incorporate by reference Paragraphs 1 through 104 as

though fully set forth herein.

129.   Plaintiffs allege in the alternative to Counts I and II, even absent an enforceable contract allowing for specific performance, but in recognition of the fact that Plaintiffs had customer agreements with the Introducing Brokers, that Apex tortiously interfered with the business relationship between Plaintiffs and the Introducing Broker-Dealers.

130.   As alleged, Plaintiffs, as Shared Customers, have a business relationship with Ally and Webull, under which Plaintiffs have legal rights.

131.   Apex, the clearing broker to the Introducing Broker-Dealers, knew of the business relationship between its Introducing Broker-Dealers and Plaintiffs, as Shared Customers.

132.   Apex unjustifiably, without privilege, and in bad faith, tortiously interfered with the business relationship between Plaintiffs and the Introducing Broker-Dealers.

133.   By failing to have a reasonable plan in place to control its risk exposure, Apex responded to the supposed exposure to climbing stock prices by willfully and intentionally suspending the ability of all of its customers and its Shared Customers to purchase the Suspended Stocks for approximately three hours and twenty-five minutes forcing those stock prices to diminish, which tortiously interfered with Plaintiffs' business relationships with the Introducing Broker-Dealers.

134. Apex was on notice from DTCC that Apex's collateralization requirement was within Apex's ability to pay and was at a level that Apex felt no need to impose the trading suspension for, yet persisted in maintaining the trading suspension on January 28, 2021 for hours, thus tortiously interfering with Plaintiffs' business relationships with the Introducing Broker-Dealers.

135. The direct and proximate cause of Apex's mismanagement of known risk, as described herein, was to force its Introducing Brokers to breach their business relationships with Plaintiffs.

136. As a direct and proximate result of Defendant Apex's conduct, Plaintiffs and the Classes have been injured and sustained damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Classes pray for a judgment against Apex as follows:

a. For an order certifying the proposed Classes, appointing Plaintiffs as Representatives of the proposed Classes, and appointing the law firms representing Plaintiffs as counsel for the Classes;

b. For compensatory damages, punitive damages, restitution, and/or refund of all funds acquired by Defendant from Plaintiffs and the proposed members of the Classes as a result of Defendant's negligence and unlawful actions described herein, in an amount to be proven at trial;

c. Payment of costs and expenses of suit herein incurred;

d. Both pre- and post-judgment interest on any amounts awarded;

e. Payment of reasonable attorneys' fees and expert fees;

f. Such other and further relief as the Court may deem proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury.

Dated:  February 14, 2022

Respectfully submitted,

Gary S. Graifman
**KANTROWITZ, GOLDHAMER &
GRAIFMAN, P.C.**
747 Chestnut Ridge Road
Chestnut Ridge, New York 10977
Phone: (845) 356-2570
Fax: (845) 356-4335
ggraifman@kgglaw.com

Peter Safirstein
**SAFIRSTEIN LAW LLC**
45 N. Broad Street
Suite 100
Ridgewood, NJ  07450
Tel: (917) 952-9458
psafirstein@safirsteinlaw.com